IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

**PENNY A. SIBOLD,**

    **Plaintiff,**

**vs.**                                                  **CIVIL ACTION NO. 1:15-13445**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

    **Defendant.**

<u>**MEMORANDUM OPINION**</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Presently pending before the Court are parties' cross-motions for Judgment on the Pleadings. (Document Nos. 9 and 11.) Both parties have consented in writing to a decision by the United States Magistrate Judge.[1] (Document Nos. 2 and 3.)

The Plaintiff, hereinafter "Claimant", Penny A. Sibold, filed an application for DIB benefits on April 18, 2012 (protective filing date), alleging disability since December 9, 2010, due to "auto immune disease, fibromyalgia, chronic fatigue syndrome, CIDP, rheumatoid arthritis, chronic back and neck pain, hypertension, limited lung function, degenerative joint disease, and chronic migraines".[2] (Tr. at 415.) Claimant's application was denied initially and upon

---

[1] The undersigned was assigned to this matter by Order entered January 5, 2016 due to the retirement of U.S. Magistrate Judge R. Clarke VanDervort. (Document No. 8.)

[2] On her form Disability Report – Appeal, submitted on March 15, 2013, Claimant asserted that since her last disability report dated May 23, 2012, she was "[h]aving more shortness of breath". (Tr. at 465.) She submitted another Disability

1

reconsideration. (Tr. at 325-329, 331-337.) On May 30, 2013, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 338-339.) A hearing was held on January 23, 2014, before the Honorable Jeffrey J. Schueler. (Tr. at 29-53.) The ALJ denied her claim by decision dated February 26, 2014. (Tr. at 9-28.) The ALJ's decision became the final decision of the Commissioner on July 27, 2015 when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On September 24, 2015, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not,

---

Report – Appeal on May 30, 2013 alleging that her "pain has gotten much worse" and that her "mobility is limited due to increased pain." (Tr. at 489.)

2

the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

> which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally,

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

In this particular case, the ALJ determined that Claimant last met the insured status requirements of the Social Security Act through March 31, 2015. (Tr. at 14, Finding No. 1.) The ALJ then found that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, December 9, 2010. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: rheumatoid arthritis; chronic obstructive pulmonary disease (COPD); chronic inflammatory demyelinating polyneuropathy/radiculopathy (CIDP); cervical and lumbar spine degenerative disc disease; obstructive sleep apnea; headaches; fibromyalgia; chronic pain syndrome; and obesity. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform sedentary work:

> However, the claimant can occasionally kneel, crawl, crouch, stoop, balance, or climb ramps and stairs. She cannot climb ladders, ropes, and scaffolds. The claimant should avoid concentrated exposure to extreme heat and cold, excessive

>  vibration, chemicals, irritants, hazardous or moving machinery, and unprotected heights.

(Tr. at 17, Finding No. 5.) At step four, the ALJ found that Claimant was capable of performing her past relevant work as a medical billing clerk, coding specialist, benefit coordinator, and data entry clerk, and that this work did not require the performance of work-related activities precluded by the RFC. (Tr. at 22, Finding No. 6.) On this basis, benefits were denied. (Tr. at 23, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on June 18, 1949, and was 64 years old at the time of the ALJ's decision. (Tr. at 463.) Claimant has a high school education. (Tr. at 416.) Claimant worked for Monroe Health Center from 1990 to January 2011 when she retired (Tr. at 39, 416, 449.); she worked in several different capacities over those years, including data entry, medical billing, benefits coordinator, OSHA compliance director, and lastly, facility manager. (Tr. at 34-39.)

Issues on Appeal

Claimant has alleged two main errors in support of her appeal: (1) that the ALJ's finding her capable of performing her past relevant work is unclear, because the transcript from the administrative hearing is also unclear as to whether certain job duties she performed during her employment at Monroe Health Center occurred within the fifteen year period prior to her alleged onset date (Document No. 9 at 2-8.); and (2) that the ALJ impermissibly substituted his opinion in lieu of Claimant's treating physician with respect to her CIDP, and improperly weighed the medical evidence. (Id. at 8-9.)

The Relevant Evidence of Record[4]

The Court has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Medical Evidence:

Claimant was diagnosed with CIDP around November 2010, and was treated by Joanne Link, M.D., a neurologist. (Tr. at 570.) Claimant was initially treated with a course of intravenous therapy, which caused side effects including gastritis and MRSA (resulting from her hospital treatment for gastritis in December 2010). (Tr. at 18, 565.) As a result, her intravenous

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

treatment did not resume until January 2011. (Tr. at 18, 565.) In January 2011, Dr. Link advised Claimant to take time off from work so she could recuperate and help her immune system to recover. (Tr. at 568.)

By April 2012, Dr. Link reported that Claimant was "very stable" since her treatment. (Tr. at 945.) At that time, Claimant stated that she was doing overall quite well; she also told Dr. Link that her treatment helped the quality of her life immensely, and that she was now able to perform her activities of daily living without falling asleep and feeling profoundly fatigued. (Id.)

Rafael Gomez, M.D., a State agency physician, reviewed Claimant's claim for benefits in November 2012 (including Claimant's CIDP), and opined that she had the physical residual functional capacity to perform light work with no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; and avoiding concentrated exposure to cold, heat, vibration, environmental irritants, chemicals, and hazards such as moving machinery and heights. (Tr. at 303-307.) At the reconsideration level, in April 2013, Porfirio Pascasio, M.D. reviewed Claimant's claim for benefits (including her CIDP) and concurred with Dr. Gomez's assessment. (Tr. at 317-320.)

Claimant's Challenges to the Commissioner's Decision

Claimant contends that because the transcript from the administrative hearing is unclear, the ALJ erred in finding that she could perform her past relevant work as a data entry clerk and a medical billing clerk occurred before the fifteen-year provision under the Regulations, and is therefore an improper finding. (Document No. 9 at 7.) With regard to the ALJ's finding that Claimant can perform her past relevant work as a "coding specialist", the testimony was unclear if she really performed such a job, or even if she had, it was not clear she performed it within the

8

fifteen-years before her onset date. (Id. at 7-8.) Regarding her prior work as a benefits coordinator, it is unclear when she did this job, however, given her status as an individual closely approaching retirement age, she would "grid out".[5] (Id. at 8.) Finally, the ALJ provided his own lay opinion in finding Claimant's CIDP treatment was "conservative" because her treating physician's opinion regarding CIDP and treatment was unchallenged, and therefore the ALJ had to give full weight to the physician's opinion. (Id. at 8-9.)

In response, the Commissioner argues that Claimant had representation, and therefore, the ALJ did not have an independent duty to develop the record regarding her employment history, of which neither Claimant nor her attorney raised any concerns; she was in a better position to prove that she was disabled, and further, she has not demonstrated actual prejudice to necessitate remand. (Document No. 11 at 5-7.) The ALJ states Claimant's contention that the ALJ could not weigh the evidence concerning her CIDP lacks merit because the Commissioner states the ALJ found it to be a severe impairment and discussed it numerous times throughout his decision. (Id. at 8.)

Analysis

Past Relevant Work:

Pursuant to 20 C.F.R. § 404.1565(a), "[w]e consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity". The burdens of production and proof in a disability determination proceeding rest with the claimant. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless [s]he furnishes such medical and other evidence of the

---

[5] The gravamen of Claimant's appeal is that the ALJ's determining that Claimant can perform her past relevant work, which was only performed "briefly" allowed him to "circumvent" the grid which would have resulted in a finding her "disabled". (Tr. at 495.)

existence thereof as the Commissioner of Social Security may require") (emphasis added). The burden lies with the claimant because she is "in a better position to provide information about h[er] own . . . condition." Bowen v. Yuckert, 482 U.S. 137, 147 n.5 (1987); 20 C.F.R. § 404.1512(a).

Claimant points to the administrative hearing transcript in support of her argument that the prior fifteen years of her past relevant work was not clear, or did not support the ALJ's finding that she could perform such work. The Court notes that it was clear from the record that Claimant had worked for Monroe Health Center for well over the fifteen year provision. (Tr. at 34.) The pertinent colloquy between the ALJ and Claimant went as follows:

Q: Okay. Tell me about that job. What were your duties in that job?

A: In the last 15 years or the entire?

Q: In the last 15 years what were your duties, yeah.

*******

Q: Okay, so you started in data entry. And at what point did you shift into other type of work?

A: Oh probably at anywhere between the five and 10 years I worked with the West Virginia state programs like Family Planning, the Breast and Cervical Cancer screening programs. And then probably about the 10, eight to 10 year mark is when I took over the position of the OSHA compliance director. And probably then the last three years, I believe, of my employment, that's when I was facility manager. Let me back up. And then actually prior to the OSHA compliance I was the benefit coordinator.

(Tr. at 34-35.) From that exchange, it would appear that Claimant's responses to the ALJ's questioning with reference to her job duties fall within the fifteen year time-period, and further, the Court notes that at no time did Claimant's attorney object if there were any inconsistencies in

the testimonial evidence or offer to elucidate if the vocational history was vague. Accordingly, Claimant's argument that the record is "unclear" as to when she performed certain job duties lacks merit.

With regard to Claimant's contention that her data entry duties were too brief to be considered past relevant work, the colloquy between the ALJ and Claimant went as follows:

Q: You said medical billing as well. Is that part of those tasks?

A: That wasn't attached, it was a different position. I would do data entry as if it were overloaded, you know, assistance needed with other employees and then I would do the medical billing. It was pretty much at that point the way it was done back then it was just run off on hard copies and mailed.

(Tr. at 35.) Pursuant to the aforementioned pertinent Regulation, 20 C.F.R. § 404.1565(a), past relevant work includes such tasks that "lasted long enough for you to learn to do it". Despite Claimant's argument that she only briefly performed data entry work, there is no evidence in the record that suggests that she did not know how to perform this "assistance" work; clearly, Claimant performed data entry clerk duties long enough to learn how to do it, otherwise, she could not have provided the assistance required when the primary data entry clerks were "overloaded". In accordance with the Regulations on this issue, Claimant's argument on this ground lacks merit.

Finally, in regards to Claimant's argument that the ALJ's finding her capable of performing past relevant work as a "coding specialist" is improper because it was not clear that she ever performed such work, the transcript from the hearing provides the following:

Q: In the medical billing were you doing – there's a certification as a medical coder, were you involved in that? Did you have a certification to do medical coding?

A: No, I did not, it was just I realize coding, you know, typically means that but it was pretty much to check the proper C.P.T. codes against what we called the counter sheets for the patients before it was, when it was printed off. It was cross matched that way.

(Tr. at 36.)

Further, when the ALJ asked the vocational expert (VE), John Newman, to identify Claimant's work "over the last 15 years", the VE responded: facility manager and safety manager[6]; medical billing; coding specialist; benefit coordinator; and data entry[7]. (Tr. at 45.) The VE explained that each of the remaining five positions were "sedentary". (Id.)

Q: Okay. I thought I understood the testimony did not include coding as a specialty, correct?

A: Well she did, she reviewed it and I'm using the coding classification description in the DOT.

Q: Okay.

A: You didn't set the codes, you reviewed the codes.

CLMT: That's correct.

VE: That's the difference between a seven and a five.

Q: Okay.

A: And she was at a five.

Q: She was at a five level.

A: If she'd have had the certification she would have been seven.

---

[6] The VE testified that both these positions were "light" and "skilled". (Tr. at 45.)
[7] The VE testified that medical billing, benefit coordinator and data entry jobs were considered semi-skilled by the Dictionary of Occupational Titles. (Id.) The VE testified further that the coding specialist job was skilled. (Tr. at 45-46.)

12

Q: Okay, thanks for clarifying that.

(Tr. at 46.)

At no time was an objection made in reference to the VE's testimony, and the ALJ sought clarification on the coding specialist job, which the VE noted was one of the many jobs Claimant performed during her tenure at Monroe Health Center, therefore, her argument that the ALJ's finding "coding specialist" as past relevant work was not clear from the record lacks merit.

In reference to Claimant's argument that due to her age, she would "grid out", it is noted that prior work experience is another important component under the Medical-Vocational Guidelines, particularly if her past relevant work was skilled:

Q: It sounds like a lot of intellectual product just going into the work that you're doing. In other words, your intellect is going into the work you're doing.

A: Mm-hmm. Of course I would attend trainings about four to five times.

Q: Is that a yes?

A: Oh, I'm sorry, yes.

Q: Okay, so this is a pretty skillful job it sounds like. Was it a job again that you had, predominately were at a work station?

A: Yes, I had an office, mm-hmm.

(Tr. at 37-38.) As noted *supra*, the VE testified that Claimant's past relevant work included both skilled and semi-skilled jobs.

Part 404, Subpart P, Appendix 2, Section 201.00(a) states "[m]ost sedentary occupations fall within the skilled, semi-skilled, professional, administrative, technical, clerical, and benchwork classifications." Subsection (e) provides: "[t]he presence of acquired skills that are

13

readily transferable to a significant range of skilled work within an individual's residual functional capacity would ordinarily warrant a finding of ability to engage in substantial gainful activity regardless of the adversity of age[.]" Table Number 1, the Medical Vocational Guidelines for maximum sustained work capability limited to sedentary work as a result of severe medically determinable impairment(s), under Rule 201.07, provides that for individuals of advanced age (55 and over) with an education level of high school graduate or more, and with previous work experience classified as skilled or semiskilled wherein the skills are transferable, the decision warrants a finding of "not disabled".

In this case, the ALJ asked the VE to assume an individual of Claimant's age, education, and work experience, who was restricted to sedentary work with no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; and avoiding concentrated exposure to cold, heat, vibration, irritants, chemicals, and hazards such as moving machinery and heights. (Tr. at 47-48.) The VE testified that despite those limitations, such an individual could perform Claimant's past relevant work as a medical billing clerk, coding specialist, benefit coordinator, and data entry clerk. (Id.) The ALJ also inquired if the skills Claimant acquired during her past relevant work experience were "highly marketable", to which the VE confirmed that they were, particularly "given the demand for people in the healthcare profession and the experience that [Claimant] . . . has." (Tr. at 50.) The ALJ asked if Claimant's skills were transferable to other types of work, and the VE responded thusly:

A: *Well they would be* but that doesn't really even come into play because the actual jobs themselves. You look at transferability. For example, let's say that your work had only been as a facility manager and you're looking at how can you use those skills in another

job because that was light. This is sedentary work, you don't need to go to that step, you just go to the job if that makes any sense. (emphasis added)

*******

Q: -- That as long as there's not an off task to the limitation then there are semi-skilled jobs that the individual could do similar to what they have.

A: Exactly, every healthcare facility in America, to my knowledge has got jobs similar to these.

(Tr. at 50-51.)

The VE testified that Claimant's skills that she acquired during her employment "would be" transferable, and further, that due to the nature of her prior work, transferability was not an issue because of the sheer numbers of available jobs that she could do, because she already possesses the necessary skills to perform them. In short, the ALJ did not "circumvent" the grids: 20 C.F.R. § 404.1568(d)(3) provides that "there are degrees of transferability of skills ranging from very close similarities among jobs. A complete similarity of all three factors[8] is not necessary for transferability." Moreover, given the VE's testimony that Claimant could perform her past relevant work, the sequential evaluation ceases, with a finding of not disabled. See Id. §§ 404.1520(a)(4)(iv), 404.1560(b)(3). Accordingly, this argument lacks merit.

Evaluation of Opinion Evidence - CIDP:

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide

---

[8] These factors are "[t]the same or a lesser degree of skills is required; [t]he same or similar tools and machines are used; and [t]he same or similar raw materials, products, processes, or services are involved." Id. § 404.1568(d)(2)(i)-(iii).

"a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. Id. Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(c)(2).

The ALJ found CIDP as one of Claimant's severe impairments. (Tr. at 14.) The ALJ also noted that Claimant began to complain of symptoms associated with her CIDP in late 2010 and early 2011, and that her symptoms "improved with treatment" and eventually, were "resolved"

because the condition was "successfully" treated. (Tr. at 15, 20.) However, the ALJ noted that Claimant retired from her job due to symptoms of CIDP and complications from treatment. (Tr. at 17.) Further, it was noted that David Roberts, M.D., Claimant's treating neurologist as well as Joanne Link, M.D., another treating neurologist, both recommended that Claimant take time off from work: "Dr. Link recommended that the claimant take some time off work for her immune symptom [*sic*] to recover and to receive her final doses of IVIG." (Tr. at 18, 842-845.); and "Dr. Roberts kept her out of work for 2 more weeks." (Tr. at 18, 835-838.) The ALJ determined that "[t]hese 'opinions' that the claimant needed to take some time off work are given little weight because they apply only to short periods of time, and under the Social Security Act, a person can only receive disability benefits for a disability lasting 12 months or more." (Tr. at 18.)

The ALJ noted that by April 2011, Claimant completed her IV treatment and reported improvement, though she complained of "profound fatigue" by June. (Tr. at 18, 811-814, 819.) Importantly, the ALJ further noted that Claimant "continued to report most of her 'poly [CIDP] – symptoms' were resolved in October" 2011. (Tr. at 19, 929.) In January and April 2012, the ALJ noted that Claimant reported her medication, Nuvigil, "had significantly helped her fatigue." (Tr. at 18, 951.) It was further noted that Dr. Link found Claimant's CIDP "remained very stable", and Claimant reported that Nuvigil "helped her quality of life immensely" and could "perform all activities of daily living without feeling profoundly fatigued" and she saw Dr. Link only a few times during the next two years. (Tr. at 19, 945.) Because the treatment of her CIDP caused temporary inability to work, especially because Claimant reported that her condition improved later in 2011, the ALJ found the impairment did not last the requisite twelve months to be disabling under 20 C.F.R. § 404.1509. (Tr. at 20.) Moreover, because Claimant's CIDP had improved to the

point that she was able to perform her activities of daily living and other activities, the ALJ found that she would not be precluded from sedentary work, consistent with his RFC assessment. (Tr. at 20-21.)

The ALJ discussed the opinion evidence solicited in this case, and with respect to Claimant's treating physician, Dr. Link, the ALJ noted Dr. Link filled out paperwork for Claimant's private disability insurance, and gave her opinions "little weight" that Claimant was incapable of engaging in stressful situations due to lack of evidence in the record, as well as her opinion that Claimant was totally disabled because it contradicted Dr. Link's opinion that Claimant "had a moderate limitation of functional capacity limiting her to sedentary work", and further, she provided no specific functional limitations for these opinions. (Tr. at 21, 884-885, 956-957.) The ALJ gave Dr. Link's opinion that Claimant had the ability to perform sedentary work "some weight". (Tr. at 21.) The ALJ further noted that Claimant "rarely mentioned mental symptoms, other than some issues with memory and concentration when she was being treated for her CIDP symptoms" and further, Claimant "did not take any psychiatric medication until 2013." (Tr. at 21.)

The ALJ recognized that Claimant received treatment for her impairments, and that they were "essentially routine and/or conservative in nature" and that the treatment "has been generally successful in controlling those symptoms." (Tr. at 20.)

Based on all the aforementioned, the undersigned finds that the ALJ neither improperly evaluated Dr. Link's opinions, nor did he improperly substitute his own lay opinion with respect to the treatment Claimant received for her CIDP. In short, despite the finding that Claimant's CIDP was a severe impairment, it did not last the requisite twelve months, and therefore, under the Regulations and controlling law, this impairment was not disabling. The undersigned further finds

that the ALJ's findings and conclusions that were supported by specific citations to the evidence of record based on substantial evidence. See, generally, Richardson v. Perales, 402 U.S. 389, 390 (1971) ("The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 9.) is **DENIED**, the Defendant's Motion for Judgment on the Pleadings (Document No. 11.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED** and this matter is hereby **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Order to all counsel of record.

ENTER: January 18, 2017.

_____
Omar J. Aboulhosn
United States Magistrate Judge